UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| JEREMY A. LANGLEY, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>BOOZ ALLEN HAMILTON HOLDING CORPORATION, HORACIO D. ROZANSKI, LLOYD W. HOWELL JR, and KEVIN COOK,<br><br>                Defendants. | Civil Action No. 1:17-cv-00696-LMB-TCB<br><br><u>CLASS ACTION</u> |

AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Uniformed Sanitationmen's Association Local 831 Compensation Accrual Fund ("Local 831") and Teamsters Locals Nos. 175 & 505 Pension Trust Fund (the "Teamsters Fund") (collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Plaintiffs' counsel. The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Booz Allen Hamilton Holding Corporation ("Booz Allen" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by Defendants, and interviews with former Booz Allen employees. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Booz Allen common stock between May 18, 2016 and June 15, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      This case arises from Booz Allen, one of the nation's largest defense contractors, defrauding the U.S. government through its cost accounting and indirect cost charging practices. This misconduct, which is currently under investigation by the Department of Justice (the "DOJ"), imperils billions of dollars in annual Company revenue from *all* of Booz Allen's government contracts.  Once the DOJ investigation is complete, Booz Allen faces, *inter alia*, the potential of substantial fines, the loss of its ability to bid on future government contracts, the loss of its ability to receive payment on existing contracts, and other significant penalties.  As Booz Allen receives nearly all of its revenue from the government, these penalties could be catastrophic to the Company and its shareholders.  Indeed, the fact that these prior practices were no longer only being investigated by the Defense Contract Audit Agency ("DCAA") – the agency tasked with auditing Department of Defense contracts – but had now been escalated to the DOJ, demonstrates the seriousness and potential scope of the allegations.

3.      The DOJ investigation comes at a time when the Company was already under siege for its business practices and ethical lapses, placing the Company at risk of losing *all* government contract business.  In light of these missteps, as discussed in more detail below, Booz Allen had precious little margin for error in its dealings with the U.S. government.  However, throughout the Class Period, Defendants repeatedly assured investors that it took steps to ensure compliance with

the government's contract rules and regulations and that its recent growth was sustainable and based on legitimate contracting practices.

4.     Defendants also repeatedly assured investors that Booz Allen was behaving ethically. For example, Defendants represented that Booz Allen was committed to "Ferocious Integrity" and "adherence to the highest ethical standards."  During a conference call, Defendant Horacio D. Rozanski ("Rozanski"), the Company's Chief Executive Officer ("CEO"), informed the market that "[w]e do what we say we'll do, and in the near term and over the long term."  In truth and in fact, however, Booz Allen was defrauding the government by, among other things, improperly overcharging it for certain expenses.

5.     As the Company's reported revenues continued to grow from these unlawful billable expenses, the price of Booz Allen stock increased.  During the 13-month Class Period (defined below), Defendant Rozanski and Defendant Lloyd W. Howell, Jr. ("Howell"), the Company's Chief Financial Officer ("CFO"), and other insiders took full advantage of the stock's artificial inflation and collectively sold or disposed of more than $26 million of their personally-held Booz Allen stock, with Defendant Rozanski selling or disposing of approximately $4.1 million of Booz Allen stock (as compared to the $2.7 million of stock that he sold or disposed of over the prior two years) and Defendant Howell selling or disposing of approximately $7.3 million (dwarfing the approximately $2.6 million of stock that he sold or disposed of in the prior two years).

6.     Then, on June 15, 2017, after the markets closed, Booz Allen disclosed that on June 7, 2017, the Company's subsidiary Booz Allen Hamilton Inc. "was informed that the U.S. Department of Justice is conducting a ***civil and criminal***[1] investigation relating to certain elements of [its] cost accounting and indirect cost charging practices with the U.S. government."

---

[1]     All emphasis is added unless otherwise noted.

7.      On this news, Booz Allen's share price fell $7.43 per share, or 18.89%, to close at $31.90 per share on June 16, 2017.

8.      Since the time that this bombshell disclosure was released to the market, Booz Allen has been tight-lipped regarding the precise nature of the wrongdoing under investigation by the DOJ. This is not unusual for a company such as Booz Allen since it is a government contractor working on numerous classified contracts (for fiscal 2016, seven of the Company's ten largest contracts, representing over $400 million in revenue for fiscal 2016, were labeled as "Classified Contracts" in the Company's filings with the SEC).  Indeed, there is a reasonable chance that complete details of its wrongful practices will never be publicly disclosed.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in this District.

12.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Lead Plaintiff Local 831, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of Booz Allen during the Class Period, and was damaged thereby.

14.     Lead Plaintiff Teamsters Fund, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of Booz Allen during the Class Period, and was damaged thereby.

15.     Defendant Booz Allen is an American management consulting firm, sometimes referred to as a government-services company, with over 80 offices around the globe.  Booz Allen is headquartered at 8283 Greensboro Drive, McLean, Virginia.   As of September 30, 2016, the Company had more than 147 million shares of common stock issued and outstanding which actively traded throughout the Class Period on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "BAH."

16.     Defendant Rozanski has served at all relevant times as the Company's CEO, President and Director.

17.     Defendant Howell has served as the Company's CFO, Executive Vice President and Treasurer since July 1, 2016.

18.     Defendant Kevin Cook ("Cook") served as the Company's CFO at all relevant times until July 1, 2016.

19.     Defendants Rozanski, Howell, and Cook are referred to herein as the "Individual Defendants."  Booz Allen and the Individual Defendants are referred to herein, collectively, as "Defendants."

20.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational

trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including information relating to the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously

issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Booz Allen's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

**CLASS ACTION ALLEGATIONS**

25.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Booz Allen during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Booz Allen common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Booz Allen and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

            (a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)      whether statements made by Defendants misrepresented material facts about the business, operations and management of Booz Allen; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

30.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

31.      Defendant Booz Allen's predecessor company was founded in 1914 as a management consulting firm.  In 1940, Booz Allen began servicing the United States government.  Booz Allen offers a range of services, including Consulting, Analytics, Digital Solutions, Engineering, and Cyber to its clients.  Booz Allen maintains its corporate headquarters in McLean, Virginia.  Booz Allen operates as a single profit/loss center with a single bonus pool for partners, vice presidents, principals, and senior associates.

32.      Booz Allen was incorporated in Delaware in May 2008 to serve as the top-level holding company for the consolidated Booz Allen U.S. government consulting business.  On July 31, 2008, Booz Allen Hamilton completed the separation of its U.S. government consulting business from its legacy commercial and international consulting business, the spin-off of the commercial and international business, and the sale of 100% of its outstanding common stock to Booz Allen Holding, which was majority owned by The Carlyle Group and certain of its affiliated investment funds ("Carlyle").  Booz Allen is the successor to the U.S. government consulting business of Booz Allen Hamilton following the separation.

33.     Between 2013 and 2016, Booz Allen registered the offering and sale of common stock by former majority owner Carlyle.  Two such offerings took place during the Class Period.  On December 6, 2016, Carlyle disposed of its remaining shares of the Company's Class A Common Stock in a registered secondary offering.

34.     The U.S. government is Booz Allen's primary client, with revenue from contracts and task orders, either as a prime or a subcontractor, with U.S. government agencies accounting for 97% of Booz Allen's revenue for fiscal 2017.  Moreover, Booz Allen derived 91% of its revenue in fiscal 2017 from engagements for which Booz Allen acted as the prime contractor.  The single largest entity that Booz Allen served in fiscal 2017 was the U.S. Army, which represented approximately 14% of Booz Allen's revenue in that period.

35.     Booz Allen is highly dependent on defense contracts.  Revenue generated from defense clients was $2.7 billion, or approximately 46.6% of Booz Allen's revenue in fiscal 2017, as compared to $2.6 billion, or approximately 48.3% of Booz Allen's revenue, in fiscal 2016.  Booz Allen's primary defense clients include the Army, Navy/Marine Corps, Air Force, and Joint Combatant Commands.  Booz Allen revenue generated from defense clients also includes foreign military sales to non-U.S. government clients.

36.     In addition, Booz Allen revenue generated from intelligence clients of $1.3 billion, or approximately 23.1% of Booz Allen's revenue in fiscal 2017, as compared to $1.3 billion, or approximately 23.4% of Booz Allen's revenue in fiscal 2016.  Booz Allen's primary intelligence clients include U.S. Intelligence Agencies, such as the National Security Agency, National Geospatial-Intelligence Agency, and National Reconnaissance Office; and Military Intelligence Agencies, such as the Defense Intelligence Agency, Service Intelligence Centers, and Intelligence Surveillance Reconnaissance units.

37.     As a government contractor, Booz Allen receives revenue from three basic contract structures.  In 2006, 49% of the Company's revenue was derived from cost-reimbursable contracts. Cost-reimbursable contracts provide for the payment of allowable costs incurred during performance of the contract, up to a ceiling based on the amount that has been funded, plus a fee.  Booz Allen generates revenue under two general types of cost-reimbursable contracts: cost-plus-fixed-fee and cost-plus-award-fee, both of which reimburse allowable costs and provide for a fee.  The fee under each type of cost-reimbursable contract is generally payable upon completion of services in accordance with the terms of the contract.  Cost-plus-fixed-fee contracts offer no opportunity for payment beyond the fixed fee.  Cost-plus-award-fee contracts also provide for an award fee that varies within specified limits based upon the client's assessment of Booz Allen's performance against a predetermined set of criteria, such as targets for factors like cost, quality, schedule, and performance.

38.     In addition, in 2006, 27% of the Company's revenue was derived from Time and Materials contracts.  Under a time-and-materials contract, Booz Allen is paid a fixed hourly rate for each direct labor hour expended, and Booz Allen is reimbursed for billable material costs and billable out-of-pocket expenses inclusive of allocable indirect costs.  To the extent Booz Allen's actual direct labor (including allocated indirect costs), and associated billable expenses decrease or increase in relation to the fixed hourly billing rates provided in the contract, Booz Allen will generate more or less profit, respectively, or could incur a loss.

39.     Finally, 24% of Booz Allen's 2006 revenue was derived from Fixed Price Contracts. Under a fixed-price contract, Booz Allen agrees to perform the specified work for a pre-determined price.  Some fixed-price contracts have a performance-based component, pursuant to which Booz Allen can earn incentive payments or incur financial penalties based on the Company's performance.As a U.S. government contractor, Booz Allen is subject to numerous laws and

regulations.  Violating these laws and regulations may lead to civil or criminal penalties, termination of U.S. government contracts, and suspension or debarment from contracting with federal agencies. As described below, Booz Allen has been either subject to or threatened with a multitude of penalties in the past, placing it on notice that future violations, such as those currently under investigation by the DOJ, would potentially jeopardize all of Booz Allen's future revenue.

### PRIOR TO THE CLASS PERIOD, BOOZ ALLEN WAS ON ALERT THAT URGENT ETHICS REFORMS WERE NEEDED TO AVOID JEOPARDIZING ITS LUCRATIVE GOVERNMENT CONTRACT REVENUE

#### False Claims for Reimbursement

41.     In 2006, a DOJ investigation determined that Booz Allen submitted false claims for travel reimbursement to the government in violation of federal contracting regulations.  Specifically, Booz Allen received rebates on travel expenses, including airlines, rental cars and hotels, but did not report those discounts to government clients and did not reduce reimbursement claims by the amount of the rebates.  Initially, the DOJ recommended that Booz Allen be barred from federal contracting as a result of these violations.  However, Booz Allen ultimately settled these allegations with the government by agreeing to pay a $3.37 million settlement.

#### DCAA Audits Uncover Billing Misconduct

42.     The DCAA is an agency of the United States Department of Defense under the direction of the Under Secretary of Defense (Comptroller).  It was established in 1965 to perform all contract audits for the Department of Defense.  Previously, the various branches of military service were responsible for their own contract audits.

43.     Former Employee 1 ("FE1") was employed at Booz Allen from 2002 until 2014. From 2002 until 2012, FE1 worked in Booz Allen's regulatory compliance group. From 2012 until November 2014, FE1 assisted with the creation of Booz Allen's ethics office, which was headed by Gale Smith.

44.     FE1 was aware that the DCAA has issued fines against Booz Allen related to "unallowables." FE1 added that the DCAA, per government regulations, had the ability to double a prior year's fine against a contractor if the contractor had not corrected errors that it made and could fine a company in triplicate if the contractor continued to improperly bill costs for a third year.

45.     Former Employee 2 ("FE2") was a senior manager in Booz Allen's Planning Reporting and Analysis department until February 2013.   Planning Reporting and Analysis ("PR&A") was part of the finance group at Booz Allen and reported to the CFO.  FE2 reported to a director of PR&A, who in turn reported to the CFO.  PR&A operated in two units.  FE2 was the head of PR&A for the defense business unit.

46.     FE2 recalled that the DCAA conducted random audits of Booz Allen's costs to confirm that Booz Allen was charging the government accurate rates for allowable expenses.  Prior to FE2's departure in 2012, Booz Allen was fined by the DCAA for expensing "unallowables" under government contracts.  Fines were as high as $1 million or more.  In 2012, FE2 recalls that the DCAA told Booz Allen that DCAA was pulling improper charges filed by Booz Allen and instructed Booz Allen to not allow unallowable charges to get through again.  Despite the warning, FE2 recalls that Booz Allen was fined again in 2013 for submitting unallowable charges.  The unallowable charges were "general" and were not tied to just one contract.

47.     DCAA audits frequently uncovered deficiencies at Booz Allen.  DCAA audits turned up numerous issues.  For example:

- DCAA Audit Report No. 6151-2006Q14980001, dated January 29, 2007, concluded that Booz Allen's "indirect and other direct cost system and related internal control policies and procedures are inadequate."

- DCAA Audit Report No. 6151-2007Q11070001, dated September 11, 2007, concluded that Booz Allen's control environment and overall accounting control system was "inadequate in part."

- DCAA Audit Report No. 6151-2010Q24010001, dated November 17, 2010, found that Booz Allen "did not estimate costs in the same manner as it accumulates costs,

did not present its own material handling costs separate from the proposed subsidiary costs, and did not follow its policies and procedures for escalating costs. . . ."

- DCAA Audit Report No. 6151-2009R11510006, dated January 20, 2012, concluded that Booz Allen's IT system general internal controls are inadequate.

### Overbilling on NASA Contracts

48.     On May 29, 2009, Booz Allen signed a Release and Settlement Agreement with the U.S. Attorney's Office, Eastern District of Virginia, to pay the United States $325,000.  A NASA contract specialist, who requested anonymity, alleged that Booz Allen was billing for employees at higher job categories than would have been justified by their experience, inflating their monthly hours and submitting excessive billing at their off-site rate.  The case was prosecuted by the Civil Division of the U.S. Attorney's Office, Eastern District of Virginia.

### Gross Misconduct in the San Antonio, Texas Office of Booz Allen

49.     In February 2012, the San Antonio, Texas office of Booz Allen was temporarily suspended from bidding on government contracts.  The Air Force determined that in April 2011, retired Air Force Lieutenant Colonel Joselito Meneses ("Meneses"), a senior associate in Booz Allen's San Antonio office, shared with four colleagues protected, non-public information regarding an information technology support services contract that would have given Booz Allen an unfair competitive advantage in competing for a contract.  An investigation revealed that Meneses brought an external hard drive containing non-public government information to his first day on the job.

50.     Booz Allen undertook an investigation following the Air Force's February 2012 proposed disbarment actions.  This investigation uncovered "other instances of improper conduct by [Booz Allen] personnel, including additional improper actions to capture the follow-on Air Force contract in question, as well as improper actions concerning other government contract capture efforts at Booz Allen locations beyond San Antonio."  Instances of improper conduct include revelations that "Booz Allen personnel have improperly obtained, handled, and used non-public information, including information that may be characterized as source-selection information, bid or

proposal information, and/or competitor proprietary information." Booz Allen also determined that "Booz Allen personnel, in some instances, were aware of their colleagues' improper conduct and chose not to report such improper conduct." Booz Allen authored an initial report regarding its internal ethics review and determined that "Booz Allen's ethics message may not be inculcated throughout the firm and specifically, beyond its headquarters location." Booz Allen also agreed to pay the Air Force $65,000.

51.     On April 13, 2012, Booz Allen entered into a three-year Administrative Agreement with the Air Force (the "Administrative Agreement") to resolve the allegations. In the Administrative Agreement, Booz Allen acknowledged that "the proposed debarment and its resulting investigation have revealed ethical deficiencies and questionable business practices that may be systemic in nature." Moreover, commencing in June 2012 and quarterly thereafter, the Administrative Agreement required Booz Allen to provide a report to the Air Force regarding its implementation of ethical remedial measures in response to the Administrative Agreement. The quarterly reports also include information regarding the status of all internal and government investigations concerning procurement-related matters and all allegations of business ethics or integrity-related misconduct that are pending, resolved, or initiated subsequent to Booz Allen's previous report.

52.     An independent firm hired to review the incident, Affiliated Monitors Inc., made the recommendation that Booz Allen form an ethics program. As a result, in 2012, Booz Allen formed an Ethics Office and promoted employee Gale Smith to the position of Chief Ethics Officer.

### ICIG Discovers Contractor Employee Time and Attendance Fraud

53.     In a pair of reports dated March 31, 2015, the Intelligence Community Inspector General ("ICIG") determined that Booz Allen employees engaged in contractor employee time and attendance fraud by virtue of being absent from their assigned worksites for the full period billed to

the contract.  The ICIG found that a Booz Allen team leader with a billing rate of $116.61 per hour falsely charged approximately 304.5 hours from October 2013 to July 2014 at a total cost of approximately $35,508.  The ICIG also found that another Booz Allen employee with a billing rate of $87.04 per hour falsely charged approximately 123.5 hours from October 2013 to September 2014 at a total cost of approximately $10,706.

### NSF Audits Uncover Improper Billing Practices

54.     In addition to the incidents described above, audits of work performed by Booz Allen for the National Science Foundation ("NSF") uncovered evidence of improper cost accounting and control deficiencies.  The NSF is a federal agency whose mission includes support for all fields of fundamental science and engineering.

55.     Recently, the NSF requested that the Assistant Inspector General for Audit, in connection with the DCAA, audit Booz Allen for incurred costs with regard to two NSF contracts for fiscal year 2008.  The publicly-available version of the NSF OIG Report No. 16-1-005, dated February 19, 2016, uncovered "$466,446 of questioned costs on the two NSF contracts, comprised of [redacted] questioned direct costs and $[redacted] in questioned indirect costs."  The report recommended that the NSF resolve the $466,446 of NSF questioned contract costs and "[w]ork with the DoD cognizant audit officials to assure that any additional corrective actions applicable to NSF are taken."

56.     Moreover, DCAA NSF OIG Audit Report No. OIG-16-1-008, also an incurred cost audit of Booz Allen for fiscal year 2008 dated February 19, 2016, noted "***significant deficiencies that it considered to be material weaknesses*** in the design or operation of the IT system general internal controls that it believed could adversely affect [Booz Allen]'s ability to ***initiate, authorize, record, process, and/or report costs in a manner that is consistent with applicable Government contract laws and regulations***."  The audit report recommended "suspension of a percentage of

progress payments or reimbursement of costs."  In response, Booz Allen "concurred with the deficiencies cited in the report and submitted a corrective action plan that proposes to correct the significant deficiencies."

57.    NSF OIG Audit Report No. OIG-16-1-011, another incurred cost audit of Booz Allen for fiscal year 2008 dated February 19, 2016, noted that the "DCAA determined that [Booz Allen]'s practice for accounting for Defense Base Act (DBA) Insurance costs in two fringe pools was not compliant because in doing so, the DBA insurance costs are allocated to all cost objectives, many of which do not require DBA insurance and do not benefit from the cost."  The report further noted that the "DCAA recommended that [Booz Allen] revise its accounting policies and disclosure statement to remove the DBA insurance costs from the two fringe pools and assign them directly to the contracts that require the insurance."

58.    Finally, NSF OIG Audit Report No. 16-1-013, dated March 31, 2016, audited incurred costs during 2009, resulting in an adverse opinion associated with Booz Allen's proposal for claimed costs and questioned *$1.2 million of indirect costs* of the $30.3 million of claimed costs on three NSF contracts.

### Booz Allen's Fraud-Ridden Charleston, South Carolina Office

59.    As part of their investigation into the facts underlying this action, counsel for Plaintiffs interviewed former employees of Booz Allen who had extensive knowledge of, and experience with, misconduct which occurred in the Company's Charleston, South Carolina office.

60.    Former Employee 3 ("FE3") worked within Booz Allen's North Charleston, South Carolina office as a project analyst from March 2015 until February 2016.  During this time, FE3 worked on Booz Allen's Veterans Benefits Management System ("VBMS") contract with the government.  FE3 was responsible for on boarding new employees at the Booz Allen North Charleston office and processing their security clearances through the U.S. Government.  FE3

estimated that Booz Allen employed over 100 employees in North Charleston at the time. Employees in the Booz Allen home office in North Charleston worked on several Department of Defense contracts, including U.S. Army and U.S. Navy contracts.

61.     FE3 also took on the added responsibility of processing security clearances for employees who worked for the Charleston, South Carolina-based technology firm SPARC, a former Booz Allen subcontractor on the VBMS contract.  On or about November 2, 2015, Booz Allen acquired the software services unit of SPARC for $53 million.  Specifically, Booz Allen acquired the software services unit, its assets, and about 270 staff who provide software development services for the U.S. Department of Veterans Affairs ("VA") and additional public and private sector clients.

62.     Not very long after being hired, FE3 was assigned to work on Booz Allen's VBMS contract.  The VBMS contract concerned the transition of the VA's claims processing system to a paperless system via software development.  An earlier VBMS contract was called VBMS CORE and was awarded to SPARC.  A second contract, VBMS CORE II, was awarded to Booz Allen, which used SPARC as a subcontractor because Booz Allen did not have the programming experience necessary to administer the contract.

**Managers Required FE3 to Falsify Timesheets on the VBMS Contract**

63.     According to FE3, supervisors at the North Charleston office instructed all employees, including contractors, to enter at least eight hours per day on their timesheets, even if they worked fewer hours, because, according to FE3's supervisor, Booz Allen would lose government money if Booz Allen did not claim all hours available under the VBMS contract.  FE3 reported that Elizabeth Kralik ("Kralik"), a program manager at Booz Allen in Charleston since October 2011, instructed new hires at SPARC and Booz Allen to bill 8 hours per day, regardless of whether the employee actually worked 8 hours.  FE3 also recalled that a Booz Allen employee named Elizabeth Mills, a Booz Allen Project Integration Manager, was "right there" when SPARC

employees were directed to inflate the hours on their timesheets.  On at least one occasion FE3's timesheet was disapproved by a supervisor because it did not include enough time billed to the VBMS contract.  FE3 was instructed to change her time entries to bill more time to the contract.

64.     FE3 also reported that SPARC was known for hosting raucous parties during work hours.  The SPARC office was often referred to as the "Frat House" by Booz Allen employees and SPARC employees.  FE3 had heard that employees had "bring your own bottle" parties, where employees brought bottles of alcohol to work.  Fridays were "beer day" and the SPARC office installed a beer tap, huge TV sets with Nintendo game sets, and a mechanical bull-style ride called "Ride the Shark."[2]  Employees wore t-shirts that said "We put the Booze in Booz Allen."  These parties occurred during normal working hours.

**Managers Intentionally Falsified Résumés Submitted to the Government**

65.     FE3's responsibilities included "onboarding" new employees, which required FE3 to submit documents to the government to obtain clearance for SPARC employees to work on government contracts.  In short order, FE3 noticed errors on employee résumés.  FE3 recalls confirming with employees that information contained on their résumés was incorrect.  As a result, FE3 was aware of employees working on the VBMS contract without proper clearance.  FE3 estimated that at least 10 to 15 SPARC employees were working on the Booz Allen VBMS project without proper clearance, which was in direct violation of the VBMS contract requirements.

66.     FE3 recalls an occasion when Kralik had altered an employee's résumé to reflect a promotion that had never occurred.  FE3 stated that this resulted in the woman being billed to the government at a higher paygrade.

67.     FE3 recalls another occasion when a government employee brought a résumé to FE3's attention because the résumé that Booz Allen was submitting to the government differed from

---

[2]     A video of an employee riding the shark can be found on SPARC's Facebook page: https://www.facebook.com/sparcedge/videos/1101708033206839/?permPage=1

a previous résumé on file for the same person.  Someone at Booz Allen had added qualifications to his résumé that he felt were not accurate and overstated his abilities.  According to FE3, Kralik doctored Booz Allen employees' résumés while individuals at SPARC doctored SPARC résumés.

## Improper Cost Expensing

68.     The Booz Allen VBMS contract was a fixed price contract, which meant that the government agreed to pay a single price for Booz Allen's work and the government would not adjust that price.  Booz Allen was expected to get the work done for the agreed upon price.  However, the VBMS contract was experiencing cost overruns and, according to FE3, "was costing [Booz Allen] money."

69.     However, according to FE3, Booz Allen had the chance to generate additional revenue when the government asked Booz Allen to modify the contract.  At that point, Booz Allen brought in employees lacking the proper skill sets and doctored the employees' résumés to increase reimbursement rates.

70.     FE3 also recalls that Booz Allen senior consultant Patricia Hulteen ("Hulteen") wanted to purchase a software license for $5,000 that would be expensed to the VBMS contract.  According to FE3, Ron Berry ("Berry"), a Chief Technologist at Booz Allen, asked Hulteen to tell the government that the license cost $100,000 in order to get more money from the government.

## Improper Conduct was Reported to Booz Allen Headquarters

71.     FE3 stated that in July or August 2015, FE3 reported all of the improper behavior he/she observed at Booz Allen to the ethics advisor for the North Charleston office, Bruce Thackston ("Thackston").

72.     Additionally, FE3 recalls that John Peterson ("Peterson"), Vice President at Booz Allen, flew in from Booz Allen headquarters to meet with FE3 and Amy Bevan, a senior HR business partner at Booz Allen.  FE3 told Peterson that Kralik had instructed employees to always report having worked 8 hours per day, even if the employee had not worked the full 8 hours.  FE3

also reported other "unethical behavior," described herein, to Peterson.  However, FE3 was told the

purpose of the meeting was to discuss "what [he/she] had done."  Based on Peterson's comments,

FE3 realized that Peterson was there to fire FE3.

### FE3 Meets with the FBI

73.      An FBI agent contacted FE3 by phone sometime on or about October 2015.  The FBI

agent did not inform FE3 how he obtained FE3's name, but FE3 had contacted the government

contracting hotline around the time of the agent's contact.  FE3 met with the FBI agent at an FBI

office in Mt. Pleasant, South Carolina.

74.      FE3 told the FBI agent about improper time reporting by employees at Booz Allen

and its subcontractor, SPARC.  The FBI agent asked FE3 questions about time reporting.  The FBI

agent also asked FE3 questions about SPARC management.  In addition, the FBI agent asked FE3 to

try to obtain information about SPARC's and Booz Allen's accounting practices on government

contracts, including the VBMS contract.  However, FE3 was not in a position at the Company to

obtain details of accounting practices and FE3 later informed the FBI agent that he/she could not

provide him with any additional information.

### MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### 2016 10-K and Earnings Conference Call

75.      The Class Period starts on May 18, 2016.  On that day, Booz Allen issued a press

release announcing the Company's financial and operating results for the quarter and fiscal year

ended March 31, 2016.  Following the issuance of this press release, the Company hosted a

conference call with analysts and investors.  During this call, Defendant Cook made the following

positive statements regarding, among other things, the Company's "sustainable quality growth":

**Kevin Cook - Booz Allen Hamilton Holding Corporation - EVP & CFO**

Thank you, Horacio.  Please turn to slide 4.  As we've noted throughout the year,
FY16 represented Booz Allen's pivot towards growth.  Over the course of the year

we talked about it as an inflection point for the firm, a year that presented significant opportunities in an improved market. . . We leaned forward by investing in growth, and achieved our best fourth-quarter book-to-bill in five years, our best full-year book-to-bill since our IPO, and our largest year-end backlog ever.  We are also very proud to have exceeded the revenue range and met the ADEPS guidance we provided last year at this time.

Our results affirm that we have the right strategy for the future.  And *FY16 marked a turning point on the path to sustainable quality growth*.  I know you have all reviewed the earnings release issued this morning.  I would like to provide a little color behind the results detailed there.  First when you look at the backlog, the type of work we're winning matters as much as the quantity.  In FY16 we had a lot of success selling work that advances our Vision 2020 strategic objectives.  It is aligned to clients' core missions, and includes more technical content.  While year-over-year funded backlog is flat, unfunded backlog and priced options are up 20% and 45%, respectively, which gives us confidence about accelerating growth.

76.     The statement referenced in ¶75 that "FY16 marked a turning point on the path to sustainable quality growth" was materially false and misleading when made and/or failed to disclose that the growth experienced by the Company was, in fact, not sustainable because it resulted from, among other things, the Company defrauding the government through billing misconduct.  By attributing Booz Allen's growth solely to legitimate factors, Defendants implicitly – and falsely – warranted that there were no illegal practices contributing to that growth.

77.     In addition, Defendant Howell also made the following representations regarding the Company's higher billable expenses in fiscal year 2016:

**Amit Singh - Jefferies LLC - Analyst**

And just on one of your earlier comments, Lloyd, about spending will subside a little in FY17 versus FY16.  As you look at your sort of margins in 2017, should we expect them to come closer to the 2015 levels?

*Lloyd Howell - Booz Allen Hamilton Holding Corporation - EVP & incoming CFO*

We have seen continued strength in our contract profitability and length.  And though we spent aggressively in FY16 to capture and record that level of backlog, we're going to work to control that spending.  *Our billable expenses were higher in FY16* and we expect a slight continued increase in FY17.  But we don't see that impacting our margins negatively.

We'll continue to lean into the market.  And we believe we can become more efficient, as you heard from Horacio.  So our reduced spending, our higher billability

- 22 -

are expected to support adjusted EBITDA margins.  They're trending back upward with a relatively flat profile quarter to quarter.

78.     In prepared remarks, Defendant Cook made the following positive comments regarding the contribution of billable expenses to the Company's revenue growth:

Second, a point about billable expenses.  ***Billable expenses contributed to our revenue growth and applied modest pressure on adjusted operating income, adjusted EBITDA, and adjusted net income***.  The FY16 uptick in billable expense was due in part to an increase in federal agency small business goals, which led to greater use of subcontractors.  This increase in subcontractor cost accounted for approximately 20% of the annual adjusted EBITDA margin decline.

***Another driver of our results was indirect spending***, which Horacio mentioned and we've discussed over the course of the year.  ***Higher indirect spending adds to the top line as a result of revenue recognition on cost reimbursable contracts***.  At the same time it negatively affects adjusted operating income, adjusted EBITDA, net income, and cash.

79.     Finally, Defendant Cook also made the following positive statements regarding the Company's "substantial[]" increase in billable expenses:

**Cai von Rumohr - Cowen and Company - Analyst**

\*          \*          \*

So billable expenses were considerably up in the fourth quarter as a percent of sales. Maybe tell us as you look at FY17 what is your assumption about billable expenses, and give us some color as to why you're assuming what you're assuming.

**Kevin Cook** - *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Hi, Cai.  It's Kevin.  You're right.  ***It was up in the fourth quarter, and actually up for the entire year substantially***.  A lot of that is driven by some of the changes in the small business subcontracting that we're required to do.  We don't expect to see that type of step function increase again in FY17.  So the good news there is that it shouldn't have any downward pressure, material downward pressure on our adjusted EBITDA margins.

***And to put it in context, the billable expenses I think in FY15 were about 26.6% of revenue and they're about 28% FY16***.  It is in some of the larger procurements with teaming partners and things like that delivering solutions there will be probably a consistent level of subcontractors going forward.  But, again, nothing -- we don't expect to see another slide.

80.     The statements referenced in ¶¶77-79 that "[b]illable expenses contributed to our revenue growth," "Our billable expenses were higher in FY16," and that billable expenses were "up

in the fourth quarter, and actually up for the entire year substantially" were materially false and misleading when made and/or failed to disclose that the Company's billable expenses were increasing because it was defrauding the government through billing misconduct. Accordingly, the Company's representations regarding billable expenses were false and misleading during the Class Period.

81.     The next day, on May 19, 2016, the Company filed its Annual Report on Form 10-K with the SEC, signed by Defendants Rozanski and Cook, reporting the Company's financial and operating results for the quarter and fiscal year ended March 31, 2016 (the "2016 10-K"). In the 2016 10-K, the Company represented steps that it took to help ensure compliance with the government's contract rules and regulations:

> The U.S. government may revise its procurement practices or adopt new contract rules and regulations at any time. ***In order to help ensure compliance with these laws and regulations,*** all of our employees are required to attend ethics training at least annually, as well as other compliance training relevant to their position.

82.     In addition, the 2016 10-K states that "[a]s a U.S. government contractor, [Booz Allen] must comply with laws and regulations relating to the formation, administration, and performance of U.S. government contracts, which affect how [Booz Allen] does business with our clients." The 2016 10-K adds that "FAR 52.203-13 requires contractors to establish a Code of Business Ethics and Conduct, implement a comprehensive internal control system, and report to the government when the contractor has credible evidence that a principal, employee, agent, or subcontractor, in connection with a government contract, has violated certain federal criminal laws, violated the civil False Claims Act, or has received a significant overpayment."

83.     Booz Allen's Code of Business Ethics and Conduct referenced in the 2016 10-K makes the following representations regarding the Company's compliance with U.S. laws:

> And while ***we comply with all applicable laws*** — this is true wherever we work around the world — ***complying with the law is just the beginning***. We also demand

that our actions, and those of our colleagues and others we do business with, reflect our values, even when it's difficult.[3]

84.     In addition, the 2016 10-K refers to the Company's "code of ethics," which is incorporated into the document by reference.  In particular, the Company's Code of Ethics for Senior Financial Officers states, in pertinent part, that:

> Each Senior Financial Officer shall comply with all applicable laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the Company's business and its conduct in business matters and the Company's financial reporting.[4]

85.     The statements referenced above in ¶¶81-84 regarding the Company's compliance with, and helping to ensure compliance with, all applicable laws and regulations were materially false and misleading when made because they failed to disclose and/or misrepresented that the Company was engaged in unethical or fraudulent behavior, including, among other things, defrauding the government through billing misconduct.  As discussed herein, the Company engaged in a host of unethical behaviors, leading to regular DCAA fines.  Moreover, the statements were also false because the Company failed to take corrective action in response to these audits.  As described by FE3, the Company turned a blind eye to numerous unethical billing and business practices in its Charlestown, South Carolina office.  Accordingly, the Company could not truthfully represent that it complied with, and helped to ensure compliance with, all applicable laws.

86.     Moreover, by speaking about the topics of the Company's growth and compliance with the government's contract rules and regulations, Defendants created a duty to speak fully about the improper billing practices that were driving the Company's growth, as well as that its improper billing practices were not in compliance with the government's contract rules and regulations.

---

[3]     https://www.boozallen.com/content/dam/boozallen_site/esg/pdf/publications/booz-allen-green-book.pdf

[4]     http://files.shareholder.com/downloads/AMDA-1HZQ6C/3619115511x0x634461/09746be8-167e-484d-abde-1d2ab236286a/boozallen-senior-financial-officer-code-of-ethics.pdf

**Defendants' Contemporaneous Knowledge or Reckless Disregard
of the Falsity of these Statements**

87.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶75, 77-79, and 81-84:

(a)     <u>FE3 reported concerns to Booz Allen ethics advisors and senior management before the Class Period even began</u>.  Prior to the start of the Class Period, FE3 reported all of the improper behavior he/she observed at Booz Allen to, among others, the ethics advisor for the North Charleston office and to Peterson, Vice President at Booz Allen, thereby alerting Booz Allen's corporate headquarters of these issues.  *See* ¶¶71-72;

(b)     Prior to the Class Period, Defendants were on alert that they needed to maintain an effective process to rectify their history of improper billing issues and other misconduct.  The Administrative Agreement entered into between the Air Force and Booz Allen prior to the Class Period (which was prompted by Booz Allen employee misconduct) required Booz Allen to submit a written quarterly report to the Air Force identifying the status of all internal and government investigations concerning procurement-related matters and all allegations of business ethics or integrity-related misconduct that are pending, resolved, or initiated subsequent to Booz Allen's previous report.  Booz Allen had also been subject to numerous adverse audit reports, including DCAA audit reports, and was therefore on notice that it needed to comply with pertinent laws and regulations or face potentially severe repercussions.  *See* ¶¶41-58;

(c)     Scienter is further established by the reckless and/or conscious disregard of numerous red flags occurring before and during the Class Period that exposed key aspects of the Company's unethical and/or illegal practices to the Company's senior-level executives and other insiders.  These red flags should have prompted an earlier effort to investigate and address the Company's wrongful cost accounting and indirect cost charging practices and to make adequate

disclosure to investors concerning the scheme and its ramifications on Booz Allen's business and operations.  *See* ¶¶41-74; and

> (d)  <u>DOJ investigation of the wrongful conduct at the Company is ongoing</u>.  The

fact that the investigations into Booz Allen's billing practices were no longer only being pursued by the DCAA, but had now been escalated to the DOJ, demonstrates the seriousness and potential scope of the allegations.  *See* ¶¶121-123.

### 1Q17 Press Release and Earnings Call

88.  On July 27, 2016, before the markets opened, Booz Allen issued a press release announcing its first quarter 2017 financial results for the period ended June 30, 2016.  Later that day, the Company hosted a conference call with analysts and investors.  During that call, Defendant Rozanski made the following positive remarks concerning Booz Allen's "sustainable quality growth":

> The first quarter results underscore that Booz Allen ***continues its path towards sustainable quality growth***.  We have a consistent track record of setting a plan and executing against it and that is precisely what we are doing.  We believe we have made the right investments in capabilities, talent and markets to maintain our long standing position as an industry leader.  ***We outperformed others in the industry as the federal market contracted while at the same time investing for the future, so we will be well positioned to capture demand.  We are demonstrating growth earlier and faster than our competitors and believe we will continue to execute well against our plan as evidenced by our guidance for the year***.

89.  Moreover, Defendant Howell had the following exchange with an analyst on the same call regarding the Company's "sustainable quality growth":

**Robert Spingarn - Credit Suisse Securities, LLC – Analyst**

Apologies.  I've been jumping between calls.  So this may have been asked.  But I wanted to ask what the embedded margin is in the guidance.  And then I also wanted to ask about the 5% or better than 5% sales growth in the quarter, which, of course, is excellent.  How come the guidance for the year is 2 to 5?

**Lloyd Howell** - *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Thank you for the question.  There was a previous question that got at this area.  You know, our first quarter performance is in line with our expectations for the full year.

*And really underscores that we're continuing to make progress towards sustainable quality growth*. I think it goes without saying, one quarter doesn't make for the entire year. We are going to continue to invest in areas that we're providing the return that we expect or exceeding our expectations. And so when you go back to the full year, top line and bottom line guidance, we feel pretty confident about that and aren't making any adjustments to it at that time. Similarly –

90.     Later on the same call, Defendant Howell made the following prepared remarks regarding the Company's "high quality" and "sustainable" growth:

The success we've had in winning contracts demonstrates that the market is responding well to the transformation our firm has undertaken in recent years. We are growing and reshaping our portfolio services and solutions and prioritizing opportunities that apply the full range of our capabilities from strategy consulting and change management to software development, data science, rapid prototyping, cyber security, engineering, and more. *That's what differentiates us from competitors and paves the way to revenue growth, that is high quality and sustainable over time*.

91.     The statements referenced in ¶¶88-90 regarding growth, including that the Company "continues its path towards sustainable quality growth," is "continuing to make progress towards sustainable quality growth," and regarding the Company's "high quality and sustainable over time" were false and misleading and omitted material information required to be disclosed, for the reasons set forth in ¶¶76 and 86.

92.     During the call, Defendants Howell and Rozanski had the following exchange with an analyst regarding billable expenses:

**Amit Singh - Jefferies LLC - Analyst**

All right. Great. Thank you, and just quickly on the billable expenses quarter-over-quarter they saw a growth again as a percent of revenues, so, you know, is that still related to just an increasing focus of the government towards small business set-asides and as you're looking for the full year, how should we see billable expenses as a percent of revenue trending.

**Lloyd Howell** - *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Sure. *As we indicated last quarter, we expect some upward pressure on billable expenses over time*. But for the year, we anticipate that to be at or very slightly above last year's 28% of revenue, which should not have a significant negative impact on our margins. You're correct. The government is requiring a small business and *we compete very effectively in that market and need to be compliant*

***with the government's wishes***.  But as I just said, we really see it just maybe being slightly above last year's 28% of revenue.

93.     The statements referenced in ¶92 regarding "upward pressure on billable expenses" and the Company's "need to be compliant with the government's wishes" were false and misleading and omitted material information required to be disclosed, for the reasons set forth in ¶¶80, 85, and 86.

94.     During the call, Defendants Howell and Rozanski had the following exchange with an analyst regarding billable expenses:

**Robert Spingarn - Credit Suisse Securities, LLC – Analyst**

And this may have been asked as well, but the growth in the indirect versus direct, is it parallel or is one growing more than the other, both in the quarter and in the guidance?

**Lloyd Howell** - *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Indirect for billable expenses?

**Robert Spingarn** - **Credit Suisse Securities, LLC – Analyst**

Well, billable expenses I suppose.

**Horacio Rozanski** - *Booz Allen Hamilton Holding Corporation - President & CEO*

Okay.

**Lloyd Howell** - *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Yes.  ***So as we indicated last quarter, we do expect some upward pressure on billable expenses over time***.  But for the year, we anticipate them to be at or very slightly above last year's 28% of revenue.  And this is largely the market that we're facing into and the government requirements around small business, ***which we are being compliant with***.  So we should not have any significant negative impacts on margins throughout the year.

95.     Finally, Defendant Howell made the following representations regarding the Company's ability to recover revenue from the government, stating that Booz Allen was not anticipating "a fundamental change":

**Lucy Guo - Cowen & Co., LLC - Analyst**

That's helpful. And follow-up is just maybe asking the question on receivables in another way. Has there been any changes in the collection patterns of your customers, maybe based on contract mix? And do you expect going forward throughout the year that receivables would come down as a source of cash?

**Lloyd Howell -** *Booz Allen Hamilton Holding Corporation - EVP & CFO*

***We don't expect a fundamental change***, but the change that we are seeing is attributable in large part to the indirect spending that accommodated our indirect rates in FY16. The government did change its policy on approval of revised rates, which means we're likely unable to bill and collect excess indirect spending, prior to the final negotiation. But this is expected and we are adjusting accordingly.

96.     The statements referenced above in ¶¶94-95 that "we are being compliant with" government regulations and that "[w]e don't expect a fundamental change" in collection patterns from the government were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶80, 85, and 86 above.

### Defendants' Contemporaneous Knowledge or Reckless Disregard of the Falsity of these Statements

97.     The facts, viewed holistically, set forth in ¶87 establish Defendants' scienter with respect to the false statements contained in ¶¶88-90, 92, and 94-95.

### 2Q17 Press Release and Earnings Call

98.     On November 2, 2016, before the markets opened, Booz Allen issued a press release announcing its second quarter 2017 financial results for the period ended September 30, 2016. That same day, the Company hosted a conference call with analysts and investors. During the call, Defendant Rozanski made the following remarks concerning the recent arrest of Martin and Booz Allen's compliance with ethical standards:

Let me discuss briefly an item that's been in the news. As you know, a former employee of Booz Allen is under criminal investigation. As we have communicated previously we fired the employee as soon as we learned of his arrest and have been cooperating with the FBI investigation.

In the weeks since the government made the case public we have been reaching out to clients and other stakeholders. They're supportive of our efforts to cooperate with the government's investigation and to keep them informed. And we intend to stay close in touch with them, as we always do.

To date there has now been no material impact on our business from the alleged criminal actions of this former employee. ***Booz Allen has been built on 100-year record of client service, dedication to excellence, and adherence to the highest ethical standards***. We are extremely proud to support our country's civil and national security missions. ***And we take the trust that all of our clients place in us very seriously. We work to earn it day in and day out***.

99. Later on the same call, in prepared remarks, Defendant Howell echoed Defendant Rozanski's comments regarding, among other things, Booz Allen's dedication to high ethical standards, stating:

And lastly, our financial results demonstrate that investors can count on us to set a plan and execute against it with discipline and focus. ***We do what we say we'll do, and in the near term and over the long term***.

100. The statements referenced above in ¶¶98-99 that Booz Allen is dedicated "to the highest ethical standards," that "we take the trust that all of our clients place in us very seriously," and that "[w]e do what we say we'll do, and in the near term and over the long term," were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶85-86 above.

101. In addition, Defendant Howell had the following exchange with an analyst regarding the Company's ability to manage indirect spending:

**Jon Raviv - Citigroup - Analyst**

Lloyd, I was wondering if you'd just address how those higher billables impact your ability, if at all, to get back to 10% -- around 10% adjusted EBITDA margin?

**Lloyd Howell -** *Booz Allen Hamilton Holding Corporation - EVP & CFO*

In short, with a higher billability and focus on delivery, we're able to generate the DL. ***At the same time we are also able to -- we have been able to manage our indirect spending that had gotten out of plan last fiscal year. So the combination of the two is creating the margin improvement that we are seeing now in the business***.

And keep in mind, I forecasted out for the entire year. So over the course of the year there will be periods where we may decide to invest or to spend because it's the right thing to do.

So we expect margin improvement, as I've said in the past, to occur over the course of the entire year.  And we are beginning to see that.  But the higher billability plus the management of our indirect spending has contributed to the margin improvements that we are experiencing.

102.    The statements referenced above in ¶101, including that "we have been able to manage our indirect spending," were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶76, 80 and 86 above.

103.    Finally, in prepared remarks at the end of the call, Defendant Rozanski made the following positive remarks regarding the Company's stability and growth:

> Thank you very much.  And thanks everyone for your questions.  *I hope Lloyd and I have made clear the strong fundamentals of our business and the optimism we feel about Booz Allen's people to grow*.  This is a conversation that is largely about numbers, and so it's very difficult to convey the energy, imagination, and dedication of the people of Booz Allen while we do this, but they are what drives our firm forward year after year.

104.    The statement referenced above in ¶103 regarding "the strong fundamentals of our business" was materially false and misleading at the time it was made, and omitted material information required to be disclosed for the reasons described in ¶¶76 and 86 above.

### Defendants' Contemporaneous Knowledge or Reckless Disregard of the Falsity of this Statement

105.    The facts, viewed holistically, listed in ¶87 establish Defendants' scienter with respect to the false statements contained in ¶¶98-99, 101, and 103:

### 3Q17 Press Release and Earnings Call

106.    On January 30, 2017, before the markets opened, Booz Allen issued a press release announcing its third quarter 2017 financial results for the period ended December 31, 2016.  That same day, the Company hosted a conference call with investors and analysts.  On the call, Defendant Howell made the following positive statements with regard to, among other things, the Company's revenue and growth:

- 32 -

*I think the best way to summarize our third quarter is that we remain on a solid growth path because we are executing with discipline against both our plan for the fiscal year and our strategy for the future*.  We have a near-term plan for business operations that supports a long-term strategy for growth, and we are executing exactly according to our plan for FY17.  That's how we run the business year after year, setting a plan and then managing with foresight and agility so that we can position ourselves for the next year, the next year and so on.

107.    The statements referenced above in ¶106, including that "we remain on a solid growth path," were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶76 and 86 above.

108.    Later during the call, Defendant Rozanski made the following remarks regarding the Company's increase in billable expenses:

**Amit Singh - Jefferies LLC - Analyst**

Hi guys.  Thank you for taking my question, and a strong topline performance.

So just regarding the guidance for the full year, could you help me understand how much of that raise in guidance is from the Aquilent M&A and I guess slightly higher expectation for billable expenses?  Earlier you were expecting 29% to 30%, now I think you are expecting 30% versus general improvement in the demand environment?

**Lloyd Howell -** *Booz Allen Hamilton Holding Corporation - EVP & CFO*

Thank you for the question.  It's a combination of all the above.  As I said in my opening comments, we expect $20 million from the Aquilent acquisition to contribute to the topline.

*As I also mentioned with a slight uptick in billable expenses due to small business set asides, particularly in our defense and intelligence markets.  That's the market that we compete in and we are responding accordingly*.

109.    The statements referenced above in ¶108 regarding the Company's alleged uptick in billable expenses were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶80 and 86 above.

**Defendants' Contemporaneous Knowledge or Reckless Disregard
of the Falsity of these Statements**

110.     The facts, viewed holistically, listed in ¶87 establish Defendants' scienter with

respect to the false statements contained in ¶¶106 and 108.

**2017 10-K, Press Release, and Earnings Call**

111.     On May 22, 2017, Booz Allen filed its Annual Report on Form 10-K with the SEC,

reporting the Company's financial and operating results for the quarter and fiscal year ended March

31, 2017 (the "2017 10-K").   The 2017 10-K made the following representations regarding the

Company's dedication to ethics and compliance:

> *Purpose and Values.*  As one of the first organizations in the United States to adopt a
> formal code of business ethics, ***we have always believed that doing what's right and
> holding ourselves and others accountable is the only way to do business****.   Our
> people are drawn by our purpose to "empower people to change the world" and live
> our values:
>
> • ***Ferocious Integrity: Do right; hold ourselves accountable***
>
> • Unflinching Courage: Speak truth to power; maintain convictions; bring bold
> thinking
>
> • Passionate Service: Embrace the mission; build community through generosity;
> make meaningful connections; listen and act with empathy
>
> • Collective Ingenuity: Find the biggest problem and solve it; be resourceful and
> creative; seek to make the biggest difference; harness the power of diversity; be
> devoted to the team
>
> • Champion's Heart: Crave being the best; bring joy to the pursuit; learn from failure;
> compete with passion

112.     In the 2017 10-K, the Company represented steps that it took to help ensure

compliance with the government's contract rules and regulations:

> The U.S. government may revise its procurement practices or adopt new contract
> rules and regulations at any time.  ***In order to help ensure compliance with these
> laws and regulations****, all of our employees are required to attend ethics training at
> least annually, as well as other compliance training relevant to their position.*

113.     In addition, the 2017 10-K states that "[a]s a U.S. government contractor, [Booz

Allen] must comply with laws and regulations relating to the formation, administration, and

performance of U.S. government contracts, which affect how [Booz Allen] does business with our clients." The 2017 10-K adds that "FAR 52.203-13 requires contractors to establish a Code of Business Ethics and Conduct, implement a comprehensive internal control system, and report to the government when the contractor has credible evidence that a principal, employee, agent, or subcontractor, in connection with a government contract, has violated certain federal criminal laws, violated the civil False Claims Act, or has received a significant overpayment."

114.    Moreover, in addition, the 2017 10-K refers to the Company's "code of ethics," which is incorporated into the document by reference.

115.    Also on May 22, 2017, during a conference call with analysts and investors, Defendant Rozanski made the following statement regarding the Company's results: "As you saw on our press release this morning, we had a great fourth quarter, allowing us to deliver better-than-expected results for the full year. *Our FY '17 performance demonstrates the fundamental strength of our business and confirms Booz Allen's position as the industry's organic growth leader*. Our record of growth is grounded in a virtuous cycle. It begins with our commitment to adding exceptional value to clients at the core of their mission priorities."

116.    Defendant Howell made the following remarks concerning Booz Allen's "industry-leading revenue growth":

> As Horacio pointed out, *industry-leading revenue growth is an engine for sustainable shareholder value creation*. We remain committed to generating near- and long-term shareholder value through revenue growth, operational excellence, and effective capital deployment. We recognize that the strength of our balance sheet, our business performance and cash generation are meaningful value-creation tools. I'll talk more about that when we get to guidance. First, let's start with the specifics of our FY '17 full year results. You'll find them on Slide 5.
>
> *                *                *
>
> Moving to the bottom line. I'm pleased to report strong results for the year. Operating income and adjusted operating income were up 8.9% and 9.6%, respectively, *due primarily to revenue growth and the positive impact of lower indirect spending*. When compared to FY '16, adjusted net income increased 6.5% to $262 million, and net income decreased 14.2% to $252 million. Net income had

- 35 -

benefited in FY '16 from a nonrecurring release of certain income tax reserves totaling $53 million.

*       *       *

Another indicator of the fundamental strength of our business is the improvement we saw in our cash position during FY '16 – '17. *The change is due to revenue growth, spending discipline and cash tax savings*. Cash from operations was 53% higher in fiscal 2017 than in the previous year, and capital expenditures were $54 million, slightly below our latest projection. As a result, our free cash flow to adjusted net income ratio was 1.25.

117.     The statements referenced in ¶¶115-116 regarding growth, including "Booz Allen's position as the industry's organic growth leader" and that "industry-leading revenue growth is an engine for sustainable shareholder value creation" were false and misleading for the reasons set forth in ¶¶76 and 86.

118.     At the end of the call, Defendant Rozanski made the following statement regarding the Company's values and ethics:

Thank you very much, everyone, for your questions. As I close here today, I want to return for the reasons of our success in FY '17. In addition to the progress we made operationally and strategically and the numbers that accompany it, which we were the vast conversation of this call. Booz Allen's culture actually played a crucial role. It's always been the fundamental driver of our performance as a firm, and actually, as an investment as well. Those of you who are familiar with our story know that we prosecute the market differently, and we operate with a unique business model that grants us both speed and agility. Our clients often remark that people are fully committed to their success, and that sets them apart, and it's beyond the simple execution of a contract. It's sometimes hard to explain how we do it, but the consistency of our performance says that there's something unique in who we are. So this past year, we took the time to put those intangibles into words so they can continue to propel us as our size, market presence and diversity of portfolio expand. I'm proud to share with you a brief synthesis. Put simply, Booz Allen's purpose is to empower people to change the world. And I think that perfectly captures the motivation and mission focus of our people. *Our firm's values, our ferocious integrity*, passionate service, collective ingenuity, unflinching courage and a champion's heart, and they are much more than words. They set the standards and demand action. They involve things like speaking truth to power, harnessing the power of diversity and finding problems and solving them. These words matter tremendously to the people of Booz Allen. The journey to write them down over the past year has created connection, unity and energy. And they matter to our clients, because they speak of the ethics and integrity that ground the virtuous cycle I described before. So for those reasons, we also believe they matter to our investors. *Our purpose and our values command Booz Allen to never stand still, never be*

- 36 -

*satisfied, never cut corners and never settle. And whether it's to retain the best people, to solve the toughest problems or to drive above-market TSR, we are committed to simply being the best. We have a great record of doing so and intend to do even better going forward*. So once again, thanks for joining us on the call. We wish you a great start to the summer, and have a great day.

119.    The statements referenced above in ¶¶111-114 and 118 regarding the Company's alleged compliance with high ethical standards, compliance with applicable laws and regulations, and revenue growth were materially false and misleading at the time they were made, and omitted material information required to be disclosed for the reasons described in ¶¶85 and 86 above.

### Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of these Statements

120.    The facts, viewed holistically, listed in ¶87 establish Defendants' scienter with respect to the false statements contained in ¶¶111-116 and 118.

### THE TRUTH BEGINS TO EMERGE

121.    The Company's billing misconduct, some of which is described above, finally began to come to light on June 15, 2017. After the close of trading on that day, Booz Allen issued a press release (the "June 15 press release") announcing that, eight days earlier, it had been informed that it was the target of a civil and criminal investigation by the DOJ. The June 15 press release further stated, in pertinent part, as follows:

On June 7, 2017, Booz Allen Hamilton Inc. (the "Company"), a wholly owned subsidiary of Booz Allen Hamilton Holding Corporation, *was informed that the U.S. Department of Justice is conducting a civil and criminal investigation relating to certain elements of the Company's cost accounting and indirect cost charging practices with the U.S. government*. To date, our internal and external audit processes have not identified any significant deficiencies or material weaknesses, or identified any significant erroneous cost charging. The Company is cooperating with the government in these matters and expects to bring them to an appropriate resolution.

122.    On this news, Booz Allen's share price fell $7.43 per share, or 18.89%, to close at $31.90 per share on June 16, 2017.

123.    Government contractors like Booz Allen must follow strict accounting rules and submit annual cost reports to federal auditors.  Typically, disputes over costs do not escalate to the point of a DOJ investigation.  Pursuant to government regulation, the Pentagon is permitted to withhold payments to a contractor if that contractor is found to have engaged in financial irregularities.  Indeed, as described above, in 2012, a Booz Allen office in San Antonio, Texas was temporarily barred over allegations that a retired Air Force officer had given the Company confidential information.

124.    During an analyst call held weeks later on August 7, 2017, Rozanski publicly addressed the investigation.  Rozanski stated, in pertinent part, as follows:

> Before I go any further, let me address the Department of Justice investigation that we disclosed on June 15.  We do not have new information to share today.  But I will underscore that resolution of this matter is of great importance to our institution and of course, to our shareholders.  We have a talented team dedicated to this matter and we are cooperating with the government.  The rest of the firm remains focused on running the business.  Because the DOJ investigation is ongoing, there are and will remain limits to what we can say about it.  The key points are these: ***We continue to believe that the DOJ is focused on certain elements of the company's cost accounting and indirect cost-charging practices with the U.S. government***.  We do not believe our GAAP accounting or financial reporting practices are the focus of the investigation.  Our firm has not been charged with any wrongdoing and we are working with the government to reach an appropriate resolution.  The time line for resolution remains uncertain.  ***But given the complexity of cost accounting issues and the fact that we are still in the early stages of the investigation, we believe it is more likely to be years than months***.
>
> We're staying close to our clients, as we always do, and keeping lines of communication open to all stakeholders, including employees, strategic partners, regulators and investors.  Today, we do not believe there has been any negative impact to our client relationships, nor is there any indication of negative impact on our ability to perform on existing contracts, bid on new ones or recruit and retain talent.  In sum, the investigation is an important matter that we are taking very seriously.  But it will progress on its own time line and in its own space.  It will be handled by a dedicated team of legal and financial experts with the support of experienced outside counsel.  The vast majority of our firm, meanwhile, continues to focus on solving problems for clients, supporting their missions and advancing the priorities that fueled our return to growth and have positioned Booz Allen for a bright future.

125.   Because the June 15 press release stated that Booz Allen "is cooperating with the government in these matters and expects to bring them to an appropriate resolution," many investors understood that the investigation would be resolved in short order, likely with the payment of a fine by Booz Allen.  For example, during the following exchange, which took place during the Booz Allen earnings call on August 7, 2017, an analyst from Cowen and Company expressed his surprise that the investigation might linger for years:

**Cai Von Rumohr - Cowen and Company, LLC, Research Division - MD and Senior Research Analyst**

Just a quick follow-up.  You've mentioned that it might take years and not months to settle the DOJ investigation.  That seems a little surprising.  But maybe you could kind of give us some more color on that comment?

**Horacio D. Rozanski -** *Booz Allen Hamilton Holding Corporation - CEO, President & Director*

As I said in the comments, these are complex topics.  It takes a while for an investigation like this to ramp up and get up to speed.  Beyond that, DOJ will manage it as they see fit and we will cooperate and assist and we'll go from there.  We would love to see this resolved as quickly as possible.  But it will take however long it takes.

126.   Later on the same call, Rozanski was pressed to disclose more information regarding the scope of the investigation:

**Jonathan Phaff Raviv -** *Citigroup Inc, Research Division - VP*

Sorry to follow up on the investigation, just wanted to get some idea.  Is it possible for you to at all cordon off or draw a circle around where some of the issues might be?  Is it company-wide, a particular office, a particular group?  Just give a sense for how broad or not broad this might be[?]

**Horacio D. Rozanski -** *Booz Allen Hamilton Holding Corporation - CEO, President & Director*

We're at the early stages of the investigation.  We are in dialogue with the Department of Justice.  But we are not in a position at this point to go beyond what we've already shared in the 8-K and on this call.

127.    Booz Allen held another conference call with analysts on August 9, 2017 at the

Jefferies Industrials Conference, during which Booz Allen again addressed the DOJ investigation.

The following exchange took place:

**Unidentified Analyst**

Could you tell me the (inaudible) in relation to, obviously, the DOJ investigation and
to the extent you can comment, is the contract cost accounting done at the task order
level or the main contract level?

**Horacio D. Rozanski -** *Booz Allen Hamilton Holding Corporation - CEO, President
& Director*

It's a difficult question to answer.  The right answer is all of the above.  You do --
you measure cost from the hourly level to the task order level to the contract level to
the enterprise level.

**Unidentified Analyst**

I mean, I guess, the reason I asked this is because, obviously, if it is at the task order
level, it seems unfathomable that the DOJ could have any impacts to grind here
because there's so many different task orders that you'd have to have so many
different people engaging in the listed activity.  So unless the entire organization is
engaging in such activity, it seems impossible that -- anyway, that's just me sounding
from my sounding board?

**Horacio D. Rozanski -** *Booz Allen Hamilton Holding Corporation - CEO, President
& Director*

Okay.

**Lloyd W. Howell -** *Booz Allen Hamilton Holding Corporation - Executive VP, CFO
& Treasurer*

We have consistently said that at this early stage in the process, we don't have a
tremendous amount to share differently than what we've already shared.  And we
don't want to be in a position where we're speculating.  And I know your question
and the questions we received today aren't trying to get us to do that, but we are
sharing what we can, what we know, and we have made a commitment to do that.
And so we're going to leave it there.

128.    The market for Booz Allen common stock was open, well-developed and efficient at

all relevant times.  As a result of these materially false and misleading statements and omissions as

set forth above, Booz Allen common stock traded at artificially inflated prices during the Class

Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Booz Allen

common stock relying upon the integrity of the market price of Booz Allen common stock and market information relating to Booz Allen, and have been damaged thereby.

129.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Booz Allen common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

130.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Booz Allen's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Booz Allen and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Booz Allen common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Booz Allen common stock was removed and the price of Booz Allen common stock declined dramatically, causing losses to Plaintiffs and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

131.   As alleged herein, Booz Allen and the Individual Defendants acted with scienter in that they knew and/or recklessly disregarded that the public documents and statements issued or

disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Booz Allen, their control over, and/or receipt and/or modification of Booz Allen's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Booz Allen, participated in the fraudulent scheme alleged herein.

132.   Additionally, the Individual Defendants and other Company insiders were motivated to consciously and/or recklessly make false and misleading statements and omissions in order to sell or otherwise dispose of shares of their personally-held Booz Allen common stock at inflated prices, yielding net proceeds of over $26 million during the Class Period, as the following chart demonstrates (Individual Defendants in bold):

| BOOZ ALLEN --- Insider Sales and Dispositions | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Filer Name | Title | Date | Shares | Price per Share | Total Sale or Disposition Amount |
| **Howell, Lloyd Jr.** | **Officer** | **5/25/2017** | **45,000** | **$39.01** | **$1,755,450** |
| Mahaffee, Joseph W. | Officer | 5/25/2017 | 50,000 | $39.00 | $1,950,000 |
| **Howell, Lloyd Jr.** | **Officer** | **5/22/2017** | **24,140** | **$38.5057** | **$929,528** |
| Mahaffee, Joseph W. | Officer | 5/22/2017 | 120,000 | $38.2504 | $4,590,048 |
| **Rozanski, Horacio** | **Officer** | **3/31/2017** | **42,554** | **$35.39** | **$1,505,986** |
| **Howell, Lloyd Jr.** | **Officer** | **3/31/2017** | **26,998** | **$35.39** | **$955,459** |
| Odeen, Philip A. | Director | 2/8/2017 | 10,000 | $34.063 | $340,630 |
| **Howell, Lloyd Jr.** | **Officer** | **12/6/2016** | **88,980** | **$37.794** | **$3,362,910** |
| Dahut, Karen M. | Officer | 12/5/2016 | 19,040 | $37.6161 | $716,211 |
| **Rozanski, Horacio** | **Officer** | **12/5/2016** | **61,020** | **$37.5705** | **$2,292,552** |
| Logue, Joseph | Officer | 11/9/2016 | 65,000 | $32.6374 | $2,121,431 |
| Logue, Joseph | Officer | 11/3/2016 | 20,265 | $32.0109 | $648,701 |
| Mahaffee, Joseph W. | Officer | 11/3/2016 | 19,347 | $32.0117 | $619,330 |
| Logue, Joseph | Officer | 11/2/2016 | 39,735 | $32.0407 | $1,273,137 |

| Mahaffee, Joseph W. | Officer | 11/2/2016 | 40,653 | $32.0443 | $1,302,697 |
|---|---|---|---|---|---|
| Logue, Joseph | Officer | 9/27/2016 | 43,777 | $31.5939 | $1,383,086 |
| Logue, Joseph | Officer | 7/27/2016 | 16,223 | $31.5 | $511,025 |
| **Howell, Lloyd Jr.** | **Officer** | **6/30/2016** | **9,126** | **$29.64** | **$270,494.64** |
| **Rozanski, Horacio** | **Officer** | **6/30/2016** | **10,519** | **$29.64** | **$311,783.16** |

133.     These sales and dispositions were unusual and suspicious, as they occurred near the time when the alleged material misstatements and omissions were made and after FE3 reported concerns to Booz Allen's corporate headquarters regarding wrongdoing.

134.     The sales and dispositions by Defendant Howell are additionally unusual and suspicious due to the size of the sales and dispositions in relation to his recent trading history. During the Class Period, which lasts just under 13 months, Defendant Howell sold and/or disposed of approximately $7.3 million worth of Booz Allen stock, dwarfing the approximately $2.6 million worth of stock sold or otherwise disposed of by Defendant Howell in the two years prior to the start of the Class Period.

135.     The sales and dispositions by Rozanski are additionally unusual and suspicious due to the size of the trades in relation to his recent trading history. The sales and dispositions executed by Rozanski during the Class Period, which lasts just under 13 months, total approximately $4.1 million. In the two years preceding the Class Period, Rozanski sold or otherwise disposed of stock worth approximately $2.7 million.

136.     Scienter is also established since, shortly prior to the Class Period, FE3 met with a vice president from the corporate headquarters and alerted him to Company practices of inflating hours and other misconduct. Defendants were also on alert that they needed to maintain an effective process to rectify their history of improper billing issues, and other misconduct, following the Administrative Agreement that the Company entered into with the Air Force prior to the Class Period. Booz Allen had also been subject to numerous adverse audit reports, including DCAA audit

reports, and was therefore on notice that it needed to comply with pertinent laws and regulations or face potentially severe repercussions.

137.     Scienter is further established by the reckless and/or conscious disregard of numerous red flags occurring before and during the Class Period that exposed key aspects of the Company's unethical and/or illegal practices to the Company's senior-level executives and other insiders.  These red flags should have prompted an earlier effort to investigate and address the Company's wrongful cost accounting and indirect cost charging practices and to make adequate disclosure to investors concerning the scheme and its ramifications on Booz Allen's business and operations.

138.     Finally, scienter is supported by the fact that the investigations into Booz Allen's billing practices were no longer only being pursued by the DCAA, but had now been escalated to the DOJ, demonstrates the seriousness and potential scope of the allegations.

## NO SAFE HARBOR

139.     The "Safe Harbor" warnings accompanying Booz Allen's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

140.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Booz Allen who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

141.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased Booz Allen common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

142.    At all relevant times, the market for Booz Allen common stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, Booz Allen filed periodic public reports with the SEC; and

(b)    Booz Allen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**LOSS CAUSATION/ECONOMIC LOSS**

143.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Booz Allen common stock and operated as a fraud or deceit on Class Period purchasers of Booz Allen common stock by misrepresenting the value of the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Booz Allen common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Booz Allen common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

144.     Specifically, on June 15, 2017, after the market closed, Defendants disclosed that the Company's subsidiary Booz Allen Hamilton Inc. "was informed that the U.S. Department of Justice is conducting a civil and criminal investigation relating to certain elements of [its] cost accounting and indirect cost charging practices with the U.S. government."  On this news, Booz Allen's share price fell $7.43 per share, or 18.89%, to close at $31.90 per share on June 16, 2017.

145.     The decline in the price of Booz Allen's common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Booz Allen common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Booz Allen's common stock and the subsequent

significant decline in the value of Booz Allen common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**ANALYSTS REACTED NEGATIVELY TO DEFENDANTS' DISCLOSURES**

146.    Following the June 15, 2017 disclosures, securities analysts expressed their concern with Defendants' disclosure of the DOJ investigation into billing misconduct.

147.    On June 16, 2017, a Cowen analyst noted, in a research report, the devastating impact of Defendants' disclosure on investor confidence, stating that "[w]e don't expect the stock to snap back until the [DOJ] matter is resolved and will await additional data points to reassess our valuation."

148.    On August 7, 2017, an Evercore ISI analyst stated that "with an ongoing DOJ civil & criminal investigation into [Booz Allen's] cost accounting practices, which has the potential to impact 77% of [Booz Allen's] total revenue, we remain on the sidelines."

149.    Also on August 7, 2017, a Jefferies analyst stated that "**The overhang remains the [DOJ] criminal and civil investigation**.  Mgmt. noted the investigation may take several years rather than months imposing an overhang for some time.  Additionally, the scope of the investigation remains unclear to mgmt. As we have previously noted the outcomes may vary drastically."

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5
Against Booz Allen**

150.    Plaintiffs incorporate ¶¶1-149 by reference.

151.    During the Class Period, Booz Allen disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    Booz Allen violated §10(b) of the Exchange Act and Rule 10b-5 in that it: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Booz Allen common stock during the Class Period.

153.    Booz Allen's knowledge of the falsity of its public statements is demonstrated by, among other things, the fact that FE3 reported concerns to Booz Allen senior management before the Class Period even began.

154.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Booz Allen common stock.  Plaintiffs and the Class would not have purchased Booz Allen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Booz Allen's misleading statements.

## COUNT II

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against the Individual Defendants

155.    Plaintiffs incorporate ¶¶1-154 by reference.

156.    During the Class Period, the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Booz Allen common stock during the Class Period.

158.    The following facts, among others, viewed holistically, establish the Individual Defendants' scienter:

(a)    FE3 reported concerns to Booz Allen senior management before the Class Period even began;

(b)    prior to the Class Period, the Individual Defendants were on alert that they needed to maintain an effective process to address concerns of FE3 and root out employee misconduct.  The Individual Defendants were on alert that they needed to maintain an effective process to address the rash of scandals that had plagued Booz Allen prior to the June 15, 2017 disclosure;

(c)    the Individual Defendants failed to check information they had a duty to monitor;

(d)    a government investigation of the wrongful conduct at the Company is ongoing; and

(e)    the Individual Defendants were motivated to perpetuate the fraud in order to sell stock at artificially inflated prices during the Class Period.

159.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Booz Allen common stock.  Plaintiffs and the Class would not have purchased Booz Allen common stock at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by these Defendants'

misleading statements.

## COUNT III

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

160.     Plaintiffs incorporate ¶¶1-159 by reference.

161.     During the Class Period, the Individual Defendants participated in the operation and

management of Booz Allen, and conducted and participated, directly and indirectly, in the conduct

of Booz Allen's business affairs.  Because of their senior positions, they knew the adverse non-

public information about Booz Allen's false financial statements and materially weak internal

controls.

162.     As officers and/or directors of a publicly owned company, the Individual Defendants

had a duty to disseminate accurate and truthful information with respect to Booz Allen's financial

condition and results of operations, and to correct promptly any public statements issued by Booz

Allen which had become materially false or misleading.

163.     Because of their positions of control and authority as senior officers, the Individual

Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Booz Allen disseminated in the marketplace during the Class Period concerning

Booz Allen's results of operations.  Throughout the Class Period, the Individual Defendants

exercised their power and authority to cause Booz Allen to engage in the wrongful acts complained

of herein.  The Individual Defendants, therefore, were "controlling persons" of Booz Allen within

the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful

conduct alleged which artificially inflated the market price of Booz Allen common stock.

164.     Each of the Individual Defendants, therefore, acted as a controlling person of Booz

Allen.  By reason of their senior management positions and/or being directors of Booz Allen, each of

the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Booz Allen to engage in the unlawful acts and conduct complained of herein.  Each of the Individual

Defendants exercised control over the general operations of Booz Allen and possessed the power to

control the specific activities which comprise the primary violations about which Plaintiffs and the

other members of the Class complain.

165.    By reason of the above conduct, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act for the violations committed by Booz Allen.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the

Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  October 20, 2017            COHEN MILSTEIN SELLERS & TOLL PLLC
                                    STEVEN J. TOLL (VSB #15300)
                                    DANIEL S. SOMMERS
                                    CHRISTOPHER LOMETTI
                                    ELIZABETH ANISKEVICH (VSB #81809)

                                    _/s/ Steven J. Toll_
                                    STEVEN J. TOLL

1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, DC  20005
Telephone:  202/408-4600
202/408-4699 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
SAMUEL J. ADAMS
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Co-Lead Counsel for Plaintiffs*

CICCARELLO DEL GIUDICE & LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

PITTA LLP
VINCENT F. PITTA
120 Broadway 28th Floor
New York, NY 10271
Telephone:  212/652-3890
212-652-3891 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Steven J. Toll, hereby certify that on October 20, 2017, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Steven J. Toll*
STEVEN J. TOLL